## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| **SARA HELTON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 23-CV-2036** |
| ) | |
| **ILLINOIS SECRETARY OF STATE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>ORDER</u>

Plaintiff, Sara Helton, filed an Amended Complaint (#11) asserting claims pursuant to the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101 et seq.) against Defendant, the Illinois Secretary of State. Presently before the court are a Motion for Summary Judgment (#20) filed by Defendant and a partial Motion for Summary Judgment (#21) filed by Plaintiff. Both parties have filed Responses (Plaintiff (#25), Defendant (#24)) and Replies (Defendant (#27), Plaintiff (#28)). For the reasons set forth below, Defendant's Motion for Summary Judgment (#20) is GRANTED and Plaintiff's partial Motion for Summary Judgment (#21) is DENIED.

## BACKGROUND

The following background facts are taken from the statements of undisputed material facts included in the parties' respective Motions, the additional facts in their Responses, and the exhibits attached to the parties' various filings.

*Plaintiff's Position and Duties*

During the relevant time period, Plaintiff worked at Defendant's Driver Services Office in Monticello, Illinois, holding the title of Drivers Facility Manager I. She was the only Drivers Facility Manager at the Monticello office.

The Position Description for the Drivers Facility Manager I position states, among other things, that the person in that position "provides, arranges for and/or supervises the training of employees as directed or needed."

Kevin Duesterhaus has been the Director of Driver Services for Defendant since March 2003. In 2020 and 2021, he oversaw the region that included Defendant's Monticello office. Regarding a Drivers Facility Manager I's training responsibilities, Duesterhaus testified that "training is part of what is in their job description; overseeing it, doing it and evaluating it." Such training could consist of "[e]verything from opening to closing[.]"

Duesterhaus explained that Defendant also employs "trainers" in various regions of the state. These trainers would go from facility to facility training employees. Stephan Roth, Director of Personnel for Defendant, testified that Defendant "restricted travel of individuals" to different facilities as a precaution during the COVID-19 pandemic. Plaintiff testified that the rotation of "trainers" between facilities was suspended during the pandemic.

Plaintiff testified at her deposition that, at least prior to the pandemic, she conducted training on a daily basis, "standing next to them and guiding, and coaching, and directing them, and training them[.]" She added: "[A]s a manager, we had

employees that we trained, that I trained until they went to the main training in Springfield. And then they came back and then I continued to train them if they had questions." Plaintiff considered training to be an essential function of her job. She could not train other employees while maintaining a six-foot distance between them at all times.

Roth has been Defendant's Director of Personnel since May 2006. In that role, he oversees hiring processes, leaves of absence, training, discipline, and job audits. Roth also sat on the Reasonable Accommodation Committee, a group of individuals who review all accommodation requests made by employees of Defendant. Roth agreed that "part of [Plaintiff's] essential job duties included the training of other employees at that facility[.]" He testified that no one at the Monticello office, other than the Driver Facilities Manager, "had the training of employees as part of their essential job functions[.]"

Plaintiff agreed that no one assigned to the Monticello office had the job description to provide, arrange for and/or supervise the training of employees other than herself. But she believed that the provision allowing her to "arrange" training meant that she could require other employees that worked underneath her to train other employees, even if the training of employees was not included within that other person's job description. She testified that this belief was supported by "the union book, [which] stated that senior employees are allowed to train other employees if requested." Plaintiff herself was not in the union, because she was a manager. She could not remember the name of the union, of which she had been a member prior to becoming a

manager, but knew that it included drivers facility employees. When asked if she had the authority to force a union member to take on duties not within their job description—along with the additional pay contemplated by the union contract—Plaintiff replied: "Absolutely not."

Plaintiff's job description also stated that a Drivers Facility Manager I "[a]dminister[s] road examinations to applicants for all classes of drivers licenses; administers and grades written drivers examinations; [and] performs cashier functions for drivers license fees[.]" In order to administer these road examinations, Plaintiff was required to be within six feet of the examinee as they were inside of the vehicle together. Further, a 2011 ADA Job Requirements Questionnaire states that the Drivers Facility Manager I position entails continuous "[i]nteracting with the public, other workers, etc." The questionnaire states that the position also requires frequently working inside.

*Training Crystal McDade*

In March of 2020, Plaintiff raised concerns with her superiors, April Aptke and Laura Gray, regarding the job performance of one of the employees that worked under her, Crystal McDade. McDade had transferred to the Monticello office from the Decatur, Illinois, facility, though Plaintiff could not recall when. Plaintiff reported that McDade was not meeting Defendant's performance standards. Of McDade's job performance, Plaintiff testified at her deposition: "She was inept[,] to be frank."

Plaintiff was instructed to provide McDade with remedial training and to provide her superiors a synopsis of her training efforts. Aptke and Gray gave Plaintiff a "document" to guide her training of McDade, but Plaintiff did not describe the document in detail. Plaintiff understood remedial training to simply mean ongoing training, given that McDade had already had her "official training" in Springfield upon starting in Decatur.

Plaintiff could not provide the training to McDade without coming within six feet of her. Plaintiff did not provide the type of remedial training requested in the spring/summer of 2020 because she was scared of COVID-19. Instead, she provided training and instruction to McDade by answering her questions or correcting her mistakes as they arose. In doing so, Plaintiff attempted to stay six feet or more away from McDade. Nevertheless, on occasions that it was absolutely necessary, she did come within six feet of McDade in the spring and summer of 2020.

At some subsequent point, Aptke and Gray talked to Plaintiff again about the training they were requiring her to conduct with McDade. It was after this conversation that Plaintiff requested that her doctor inform Defendant of her medical condition.[1]

---

[1] At Plaintiff's deposition, counsel suggested that the conversation with Aptke and Gray occurred on August 28, 2020. While Plaintiff could not recall the exact date of the conversation, she did not take exception to the date suggested by counsel. The court notes that the August 28 date would align with the September 1 letter from Plaintiff's doctor discussed below.

Plaintiff testified at her deposition that the most senior person working under her at the Monticello office was Linda Downing. Plaintiff believed Downing's job title was Customer Service Representative. Downing's job description did not include providing, arranging for, or supervising the training of other employees. Nevertheless, Plaintiff testified that, at some point during the pandemic, she "arranged for the most senior person who did not have any medical issues and was willing to help train [McDade]. It says in the union contract that a senior employee may do so. So I had carried out my responsibilities."

*Plaintiff's Condition and Her Request for Accommodation*

Before the COVID-19 pandemic, Plaintiff was diagnosed with atrial fibrillation, the only medical condition relevant to her instant cause of action. Her atrial fibrillation did not prohibit her from training other employees before the onset of the pandemic.

On September 1, 2020, Plaintiff's cardiologist, Dr. Abraham Kocheril, wrote a letter to Defendant asking it to excuse Plaintiff from "close contact or training other employees to avoid the Covid 19 infection," citing her cardiac history. At the time that Dr. Kocheril wrote this letter, he was concerned that Plaintiff was at greater risk of suffering complications related to COVID-19 than an average working-age healthy person, particularly in light of how highly transmissible COVID-19 was, especially for people that were indoors and in close contact with one another. He believed that Plaintiff should be restricted from performing any job functions that required her to be within six feet of others while at work. While Defendant's COVID-19 protocols allowed employees to be within six feet of others if they wore a mask, Dr. Kocheril, citing the

6

relative unavailability of N95 masks at the time, wanted to make sure that Plaintiff maintained a six-foot distance at *all* times.

On September 3, 2020, Defendant emailed Plaintiff in response to Dr. Kocheril's letter. The email stated: "Based on the duties of your position as the Drivers Facility Manager I at the Monticello Drivers Facility, you will need to submit a Request for Reasonable Accommodation and provide more information, i.e., what is considered close contact, can you perform drive exams, can you continue other duties of this position in relation to day-to-day customer service?" Plaintiff was encouraged to complete the attached form with her physician.

Plaintiff submitted a Request of Reasonable Accommodation form on September 11, 2020. Her description of the accommodation being requested read, in full: "Due to Covid 19 and 6 [foot] social distancing, I am requesting to not train as if 'new employee' until SOS restrictions are removed."[2]

In a portion of the Request form filled out by Dr. Kocheril (or his nurse), it is written: "Patient is able to perform all essential function except H-53" due to COVID-19 safety precautions. "H-53" is a reference to section H.53 of the ADA Job Requirements Questionnaire, discussed above. Section H.53 contemplates "[e]xposure to infection (germs, bacteria, viruses, etc.) (This question refers to a risk greater than the risk to the

---

[2] The confusing language employed here—"as if 'new employee'"—is never directly addressed by the parties. However, some light is shed on the matter in a later letter written by Plaintiff, in which she writes, presumably referencing McDade, "I have been directed to start over again and train as if she were a new hire[.]"

average person.).” Dr. Kocheril recalled at his deposition that he had reviewed the ADA

Job Requirements Questionnaire in filling out Plaintiff's Request form. He agreed that

the portion of the Request form referencing section H-53 should be read as stating:

“Patient is able to perform all essential functions except exposure to infection, such as

germs, bacteria, viruses, et cetera that is a risk greater than the risk to the average

person due to COVID-19 safety precautions.” Dr. Kocheril believed that “[i]f [Plaintiff]

had to be within that 6 feet for any significant length of time, that would be a concern. It

would be better avoided.”

On September 16, 2020, Roth sent Plaintiff a letter indicating that the Department

of Driver Services determined that it was unable to accommodate Plaintiff's request,

and that the Reasonable Accommodation Committee agreed with decision. Citing Dr.

Kocheril's concerns, Roth wrote that “we . . . cannot guarantee a [sic] environment void

of germs, bacteria or viruses.” The letter continued:

> Due to this decision, it will be necessary for you to immediately leave your work
> location. Since your physician has indicated that these restrictions are considered
> to be temporary in nature, you have the option to apply for a leave of absence
> (forms enclosed) or you may choose to submit a resignation to our office.
> Beginning immediately, you will be required to utilize your accrued benefit time
> for these absences.

In closing, the letter provided a fax number, in the event that Dr. Kocheril wished to

submit additional medical documentation.

On September 25, 2020, Plaintiff submitted two forms—titled “Leave of Absence

Request/Extension/Medical” and “Medical Leave Certification”—requesting leave

under the Family and Medical Leave Act (“FMLA”). The latter form was filled out by

8

Dr. Kocheril. On that form, one question asked: "Will the patient be incapacitated for a **_continuous_** period of time due to this medical condition?" Dr. Kocheril checked the box corresponding to "No." The box immediately below states: "During the **_continuous_** absence — check one:" and Dr. Kocheril checked the line corresponding to the following proposition: "Employee is **_temporarily_** disabled and unable to perform one or more of the essential functions of his/her position." Elsewhere in the medical form, Dr. Kocheril noted that Plaintiff's atrial fibrillation could result in "flair ups [sic] 1-2 times per month lasting 1-2 days per episode." The Medical Leave Certification only concerns Plaintiff's atrial fibrillation—it contains no reference to COVID-19 or Plaintiff's risk of infection.

On October 5, 2020, Roth sent another letter to Plaintiff. Roth stated that his office had received Plaintiff's request for sporadic FMLA leave, but observed that the "request did not mention the concerns presented in the September 16, 2020[,] correspondence from our office." Roth added: "The additional documents received in response to our letter, do not retract nor change any of the restrictions previously submitted by your physician, therefore the action required of you by this office will remain the same."

On October 14, 2020, Plaintiff wrote a letter to Defendant expressing confusion as to why she had been given ADA paperwork, vehemently insisting that she was *not* disabled, and explaining that Dr. Kocheril would not request a leave of absence for that very reason. Plaintiff also sought clarification as to why she could not simply arrange for some other employee, one without health issues, to train McDade.

On October 19, 2020, Defendant sent a letter to Plaintiff reiterating that in the absence of new medical documentation from a physician, the determination that she could not return to work and would need to apply for a leave of absence was unchanged.

*Continued Correspondence and Plaintiff's Return to Work*

On November 20, 2020, Defendant sent a letter to an attorney retained by Plaintiff, responding to his written request that her position be reinstated. Defendant explained that regardless of her request to have someone else train employees in her stead, Plaintiff's job status was in question due to the physician's order that she may not have close contact with any employees nor be exposed to infection, explaining that her job required her to interact with both customers and co-workers that at times necessitated close contact, and that Defendant could not guarantee a work environment entirely free from germs, bacteria, or other viruses. Defendant again informed Plaintiff that she could submit additional documentation from her physician.

On January 21, 2021, through her counsel, Plaintiff submitted a letter dated the same day from Dr. Kocheril, in which Dr. Kocheril advised that Plaintiff was "released for return to work, performing her standard job duties. She is able to be around others (co-workers or members of the public) for short periods of time, but prolonged close exposure should be avoided. Once she has received the COVID-19 vaccine, these restrictions will be lifted."

On January 25, 2021, Defendant sent a letter to Plaintiff requesting additional clarification regarding some of the terms used by Dr. Kocheril, specifically as to the terms "short periods of time," "prolonged exposure," and whether the Plaintiff had made an appointment to receive the COVID-19 vaccine.

On February 10, 2021, Plaintiff's counsel advised Defendant that Plaintiff had received her first of two COVID-19 vaccination shots.

On February 11, 2021, Defendant sent Plaintiff a letter advising that, based upon the then-existing Centers for Disease Control ("CDC") guidelines, a patient was not fully inoculated from the virus with the first shot, and as a result, she could not return to work at that time. The letter requested that her physician provide further information if he felt differently.

On March 10, 2021, Plaintiff's attorney provided documentation showing Plaintiff had received her second vaccination on that date.

On March 12, 2021, Defendant sent an email to Plaintiff's attorney requesting clarification as to whether Dr. Kocheril was allowing her to return to work immediately after receiving the second vaccination or two weeks following the second dose, as recommended by the CDC. Plaintiff's counsel responded the same day, confirming that the doctor agreed that two weeks following the second dose was the appropriate date to return.

On March 16, 2021, Defendant sent Plaintiff a letter advising her that based upon the medical documentation provided, she was permitted to return to work on March 24, 2021. Plaintiff did return to work on that date.

11

*Plaintiff's Declaration*

A Declaration (#25-2) signed by Plaintiff on June 5, 2025, is attached to her Response. Therein, she states: "There is training required for new employees and that can be formal or informal. The training can be performed by me or by someone else. [Defendant] provides for new employee training in Springfield. They also have trainers who come to the individual facilities to provide for training." Plaintiff continues: "At the Monticello location we had two employees, Linda and Lori, who had trained, were capable of training, and were willing to train employees. They were both Public Service Representatives. Lori had been assisting in training Crystal McDade and others prior to Covid."

Plaintiff further explains in her Declaration that McDade was not a new employee when she started at the Monticello office; she had received full, formal training at her prior position in Decatur. Thus, what McDade needed was informal training. Plaintiff states that at the time she was "asked to leave," McDade had not been provided this informal training, and that "[d]uring the period of time that I was forced out of the office, no one else was brought in to train [her]."

*The Collective Bargaining Agreement*

Plaintiff has also attached to her Response the Collective Bargaining Agreement ("CBA") (#25-1) between Defendant and the Service Employees International Union Local No. 73 that was in effect at the time in question. Section 38.4.4 of the CBA states that "Employees who are placed in positions identified by management as Trainer

positions shall receive additional compensation over their regular rate of pay of seventy-five dollars ($75) per month." The CBA is silent as to what "Trainer positions" consist of, who may be put in such positions, or by whom employees may be placed in such positions.

The CBA explicitly lists—at pages 1 through 3—the positions within the "Clerical Bargaining Unit" to whom the agreement applies. "Customer Service Representative" is not listed among those positions. "Public Service Representative" *is* listed.

## ANALYSIS

Although not apparent on the face of her Amended Complaint, Plaintiff explains in her Response that she has actually brought three discrete claims under the ADA: (1) she was denied the reasonable accommodation of not having to train employees; (2) Defendant discriminated against her on the basis of her disability when it forced her into a leave of absence in September 2020; and (3) Defendant discriminated against her again when it would not allow her to return to work after Dr. Kocheril cleared her in his letter dated January 21, 2021.

Plaintiff moves for summary judgment as to liability on at least the first two of these claims—the notion that Defendant engaged in a separate discrete act of discrimination after January 21, 2021, is not addressed in her Motion. Defendant moves for summary judgment on whatever ADA claims Plaintiff has raised on the grounds that, inter alia, Plaintiff was not able to perform the essential functions of her job, and was thus not entitled to ADA protections.

13

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court is tasked with deciding, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is appropriate only where the evidence is such that no reasonable jury could return a verdict in the nonmovant's favor. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). In other words, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the court's favor toward the nonmoving party does not extend to drawing inferences that are only supported by speculation or conjecture. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). In addition, this court "need not accept as true [the non-moving party's] *characterization* of the facts or [their] legal conclusion." *Nuzzi v. Nguyen*, 2009 WL 1409703, at *8 (C.D. Ill. May 20, 2009) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387

F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). To survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007).

"When parties file cross-motions for summary judgment, each motion must be assessed independently[.]" *In re Aon Corp. Wage & Hour Emp. Pracs. Litig.*, 2011 WL 248448, at *2 (N.D. Ill. Jan. 26, 2011) (citing *M. Snower & Co. v. United States*, 140 F.2d 367, 369 (7th Cir. 1944)). Cross-motions for summary judgment are evaluated under the ordinary standards for summary judgment. See *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

*The ADA*

Title I of the ADA provides that no qualifying employer may "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination against a qualified individual on the basis of disability is defined to include a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]" 42 U.S.C. § 12112(b)(5)(A).

15

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, in order to prove a violation of Title I's antidiscrimination provisions, a plaintiff must prove that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation. *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000).

*Defendant's Motion for Summary Judgment*

Defendant argues that Plaintiff has failed to introduce evidence from which a reasonable trier of fact could conclude that she was able to perform the essential functions of her job—a required element for each of her ADA claims.[3]

"[T]he essential functions are the 'fundamental job duties' of a position, rather than the position's 'marginal functions[.]' " *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853-54 (7th Cir. 2015) (quoting 29 C.F.R. § 1630.2(n)). To determine what constitutes an essential function of a position, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this

---

[3] Defendant also argues that Plaintiff cannot prove that she was disabled and that it had a legitimate, nondiscriminatory basis for its employment actions. The court need not reach these arguments.

description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The Seventh Circuit has identified the followed factors as relevant in determining whether a particular duty is an essential function: "[1] the employee's job description, [2] the employer's opinion, [3] the amount of time spent performing the function, [4] the consequences for not requiring the individual to perform the duty, and [5] past and current work experiences." *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010).

It is undisputed in this matter that Plaintiff could not train other employees. As reflected in the opinion of her cardiologist, Plaintiff's atrial fibrillation put her at greater risk of complications from COVID-19. For that reason, and because of the then-existing disparity in access to N95 masks, Dr. Kocheril opined that Plaintiff should be restricted from performing any job functions that required her to be within six feet of others while at work. And Plaintiff did not request, nor has she suggested here, an accommodation that would have allowed her to perform that duty. Rather, Plaintiff's requested "accommodation" was that she simply be excused from training others altogether. See *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) ("If the proposed accommodation does not make it possible for the employee to perform his job, then the employee is not a 'qualified individual' as that term is defined in the ADA.").

The pertinent question then, is whether training was an "essential function" of her position.

17

Most of the relevant factors identified by the Seventh Circuit support the conclusion that training employees was an essential function of Plaintiff's position. First, Roth made clear that Defendant's opinion is that training is an essential function of the Drivers Facility Manager. Indeed, for what its worth, Plaintiff herself believed that training was an essential function of her job.

As for the amount of time spent performing the function, Plaintiff testified that she engaged in training on a "daily basis," which included "standing next to them and guiding, and coaching, and directing them, and training them[.]" As Duesterhaus testified, the training consisted of"[e]verything from opening to closing[.]" Unquestionably, tasks performed on a daily basis are more likely to be regarded as essential. See *Squibb v. Mem'l Med. Ctr.*, 2006 WL 988458, at *19 (C.D. Ill. Apr. 13, 2006), aff'd, 497 F.3d 775 (7th Cir. 2007) (observing that the requirement of lifting 50 pounds on a daily basis "demonstrates that lifting is an essential job function"); cf. *Dobosz v. Quaker Chem. Corp.*, 2016 WL 4376528, at *13 (N.D. Ind. Aug. 16, 2016) ("[J]ust because Dobosz was not required to do some of the physical tasks daily does not mean that the physical tasks were not essential functions.").

"Past and current job experiences" is more helpfully defined in the Code of Federal Regulations as "[t]he work experience of past incumbents in the job" and "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(vi-vii). Little evidence has been presented on these fronts, but the testimony of Duesterhaus describing the training responsibilities makes clear that they were not unique to Plaintiff, but applied to all Drivers Facility Manager I's generally.

18

As for Plaintiff's job description, Defendant points out that training of other employees is expressly contemplated in the job description for a Drivers Facility Manager I. Plaintiff raises a dispute, insisting that the job description "does not indicate that she is personally required to provide training for employees. What it states is she is to 'arrange for and/or supervise the training of employees.'"

In making this argument, of course, Plaintiff has conveniently omitted a key word; the job description states that a Drivers Facility Manager I "*provides*, arranges for and/or supervises the training of employees as directed or needed." (Emphasis added). Thus, contrary to Plaintiff's position, the job description clearly contemplates that she might be directed or needed to personally provide training—just as she was in this instance by Aptke and Gray. That Plaintiff might also, or separately, be directed or needed to instead arrange for training, or supervise training, does not change that fact. Again, Plaintiff testified that she herself provided training to her employees on a regular basis.

Further, aside from Plaintiff's own job description, the court finds it relevant that no training obligations appeared in the job descriptions of anyone else who worked in the Monticello office. The importance of training in any workplace is self-evident, and the fact that training obligations did not appear in the job description of any other Monticello office employee tends to suggest it was an essential function of Plaintiff's position.

Among the relevant factors guiding an essential function analysis, the only one for which Plaintiff actually argues she has any favorable evidence is the consequences for not requiring the individual to perform the duty. She points out that after she was forced to take a leave of absence, she was not replaced with anyone that trained McDade in her stead. Thus, she wonders: "If [Plaintiff's] performance of that duty was so essential to her job, how could they go for nearly six months without having someone perform it in her absence? The fact that no one was brought in to perform that job and temporarily replace [Plaintiff] is further evidence that this was not an essential function that required [Plaintiff's] performance."[4]

Defendant first observes that it is entirely unclear how Plaintiff would have any personal knowledge of what happened at the Monticello office while she was gone. This point is well-taken. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge [and] set out facts that would be admissible in evidence[.]" Fed. R. Civ. P. 56(c)(4). "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. While "[e]vidence to prove personal knowledge may consist of the witness's own testimony," no such evidence has been provided here. In

---

[4] Plaintiff's argument on this point derives entirely from the following excerpt from her Declaration: "During the period of time that I was forced out of the office, no one else was brought into train Crystal McDade." Defendant asks the court to disregard Plaintiff's Declaration entirely under the sham affidavit rule. Out of an abundance of caution, the court is inclined to consider the Declaration. In any event, the specific excerpt in question—regarding the lack of replacement training—does not contradict Plaintiff's deposition testimony, nor is it such a significant or critical fact that its omission from Plaintiff's deposition is indicative of bad faith.

short, Plaintiff does not appear to have any competent evidence concerning what happened at the Monticello office while she was away.

Even if Plaintiff's statement is assumed to be admissible, Defendant also identifies the paradoxical nature of Plaintiff's argument. That McDade—who was apparently greatly in need of training—was not trained in the six months that Plaintiff was away tends to underscore how essential Plaintiff was to performing that task. In other words, Plaintiff has established that "the consequence[] for not requiring the individual to perform the duty," *Gratzl*, 601 F.3d 674 at 679, was simply that the duty did not get performed—which does not advance her case. Moreover, to the extent that Plaintiff is implicitly arguing that training in general was an unessential duty, her Declaration does not speak to the actual consequences of the six months in which McDade did not receive training. That is, there has been no indication of what McDade's performance was like in that period, or the effect of that performance on the operations of the Monticello office.

Finally, Defendant argues: "In addition to employee training, the record is clear that Plaintiff could not perform other essential job functions, either." Plaintiff's position required continuous interactions with the public in an office, and she was required to administer driver examinations, which involved being inside of a motor vehicle with a participant well within six feet of one another. Dr. Kocheril's opinion was that Plaintiff should be restricted from performing any job functions that required her to be within six feet of others while at work—an opinion that would seem to prohibit her from myriad other duties in addition to training.

21

Defendant's point is not a post hoc justification for its conduct. On the contrary, in its initial response to Plaintiff's request to be excused from training, Defendant alluded to the fact that Dr. Kocheril's concerns about social distancing would seem to apply with equal force to many of Plaintiff's other job duties, writing: "[C]an you perform drive exams, can you continue other duties of this position in relation to day-to-day customer service?" Plaintiff did not answer those questions then, and she does not now respond to Defendant's argument. Nor does she otherwise point to any evidence to suggest that (a) these were not essential functions of her job, or (b) she was somehow able to do them.[5]

Plaintiff makes much of the fact that "[t]here were at least two other individuals who could have provided this training. Furthermore, the collective bargaining agreement specifically permitted this to occur. It would have cost [Defendant] about $75 per month."

As an initial matter, the court finds that the CBA does not constitute reliable evidence from which any reasonable inferences can be drawn. That document, to which Plaintiff was not a party, references "Employees who are placed in positions identified by management as Trainer positions[,]" but never defines "Trainer positions," or otherwise explains how employees may come to find themselves in such positions. The

---

[5] There is simply no answer in the record as to why Plaintiff requested an accommodation from training because her atrial fibrillation made it too risky to get within six feet of other people, even with a mask, but did not need an accommodation from any of her other duties that also would have surely required her to break social distancing.

only "Trainer positions" referenced anywhere else in the record were Defendant's roving Trainers who worked at multiple facilities, but Plaintiff testified that that program was suspended during the pandemic. While Plaintiff suggests that assigning one of the Monticello office's Public Service Representatives to do training would be as simple as paying them an extra $75 per month, there is not enough information in the CBA to draw that conclusion.

That being said, Plaintiff did testify that she had previously arranged for Linda Downing to assist in training McDade, and added in her Declaration that a "Lori" had assisted in training as well. Thus, even setting aside the CBA, the court accepts that others in the Monticello office were capable of conducting training.

That fact, however, does not measurably impact the essential function analysis. "An employer need not reallocate the essential functions of a job, which a qualified individual must perform." *Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001) (cleaned up). "The fact that restructuring is feasible, in itself, is not persuasive evidence one way or the other that a function is essential to a job." *Id.* at 930 ("Basith's suggestion would result in a restructuring of both his job and the jobs of other employees. This is not required by the ADA."); see also *Shell v. Smith*, 789 F.3d 715, 719 (7th Cir. 2015) ("[A]n employer's ability to assign duties to another employer does not make them nonessential[.]"); *Smith v. Cook Cnty.*, 2019 WL 1515007, at *5 (N.D. Ill. Apr. 8, 2019) ("[T]he possibility that overtime and out-of-shift work obligations could be reassigned among [other employees] does not make those obligations nonessential.").

In sum, there is no evidence from which a reasonable trier of fact could conclude that the training of employees in her office was not an essential function of Plaintiff's position. It is undisputed that Plaintiff was medically unable to do that portion of her job—and presumably other parts of her job—because they required her to be within six feet of others, and her atrial fibrillation put her at an increased risk of infection during the COVID-19 pandemic. ADA protections extend only to "qualified individuals," defined in part as people who "can perform the essential functions of" their job. 42 U.S.C. §§ 12112(a), 12111(8).

Because Plaintiff therefore does not meet the definition of "qualified individual," her ADA claims necessarily fail, and Defendant's Motion for Summary Judgment (#20) must be GRANTED. See, e.g., *Guzman v. Brown Cnty.*, 2016 WL 7839143, at *7 (E.D. Wis. Sept. 1, 2016), aff'd, 884 F.3d 633 (7th Cir. 2018) ("Having failed to establish that she is a qualified individual for the purposes of the ADA, Guzman's ADA claim necessarily fails and Defendant's request for summary judgment on Guzman's ADA claim will be granted."). It follows, a fortiori, that Plaintiff's partial Motion for Summary Judgment (#21) must be DENIED.

IT IS THEREFORE ORDERED THAT:

(1) Defendant Illinois Secretary of State's Motion for Summary Judgment (#[20]) is GRANTED.

(2) Plaintiff Sara Helton's partial Motion for Summary Judgment (#[21]) is DENIED.

(3) Judgment is entered in favor of Defendant and against Plaintiff on the claims contained in the Amended Complaint (#[11]).

24

(4) This case is terminated.

ENTERED this 20th day of January, 2026.

<u>s/Colin Stirling Bruce</u>
COLIN S. BRUCE
U.S. DISTRICT JUDGE